**ORIGINAL**

05-10109

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

MAR - 2 2005

CLERK, U.S. DISTRICT COURT

By _____
Deputy

SECURITIES AND EXCHANGE COMMISSION,    :

Plaintiff,    :

vs.    :    Civil Action No.

PREMIUM INCOME CORP., INFOREX, LTD.,    :
TRI-FOREX INTERNATIONAL, LTD.    :
also known as TRI-FOREX, LTD. and    :    **3 - 05 CV   0 4 1 5**
INTERNATIONAL FOREX COMPANY,    :
GERALD LEO ROGERS also known as    :
JAY ROGERS and JAY RODGERS, and    :
ALEXANDER IGOR SHEVCHENKO,    :

Certified a true copy of an Instrument
on file in my office on _____
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

Defendants,    :

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

### SUMMARY

1.    Since at least January 2004 to the present, the Defendants have engaged in an unregistered and fraudulent securities offering involving the purported trading of foreign currencies. Through their fraudulent conduct, the Defendants have raised at least $8.5 million from at least 100 investors, most of whom are Texas residents.

2.    The scheme has been orchestrated by Gerald Leo Rogers, a twice-convicted felon, whose criminal and securities fraud history spans nearly four decades. His fraudulent conduct in this matter, which started immediately after his parole from a 25-year prison sentence, targets retired and older investors with promises of "guaranteed profits" and "safety of principal."

3.      The representations and promises made to investors are false. In reality, Rogers is operating a "*ponzi*" scheme; investors' funds have not been used to trade foreign currency options, as promised.   Rogers and Shevchenko control all of the accounts into which investor funds are deposited, and Rogers has transferred nearly $7 million to offshore bank accounts.

4.      In addition to making false representations to investors concerning the nature of the investment and the use of investor funds, the Defendants have failed to disclose Rogers' criminal and securities fraud history to investors.

5.      The Commission, in the interest of protecting the public from further fraudulent activities, brings this action seeking an order permanently enjoining the Defendants from further violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] ("Exchange Act"), and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. The Commission also seeks an order requiring the Defendants to disgorge all ill-gotten gains, plus prejudgment interest thereon, and to pay civil monetary penalties.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].   Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

7.    Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts and transactions described herein took place in the Northern District of Texas.

## DEFENDANTS

8.    **Gerald Leo Rogers** aka, Jay Rogers, Jay Kellum, Jerald Rogers Kingston, Gerald Lee Rogers and Roger Charles Gillam, age 69, of Seattle Washington, is the mastermind of the fraudulent scheme described herein.  Rogers has a securities fraud and criminal history that spans nearly four decades.  Rogers is the subject of multiple criminal fraud convictions, federal civil injunctions and state cease and desist orders.  Rogers created the PIC investment program within months after his release from prison in Arizona.  Rogers is variously referred to as the CEO, Secretary and Treasurer of PIC. Rogers claims to have been affiliated with Defendant Tri-Forex International, Ltd. ("Tri-Forex") for 19 years.  Rogers also purports to personally manage all accounts greater than $1 million.

9.    **Alexander Igor Shevchenko**, age 64, of Shoreline Washington, is a co-signatory on several PIC bank accounts and is listed on PIC correspondence as a "manager", "director", or "CEO" of PIC.  Shevchenko is a 50 percent owner of PIC.

10.    **Premium Income Corp.** is a Wyoming corporation created in January 2004 with its business address in Seattle, Washington.  Since at least May 2004, PIC has been marketing an investment program that claims to place investor funds in "covered calls" in the foreign currency exchange market.  PIC uses a network of sales persons as well as Internet websites to promote these investments.  In promoting its programs, PIC targets the elderly and persons investing retirement funds.

11.    **Tri-Forex International, Ltd.** is an entity that maintains its last known business addresses at the same Seattle, Washington locations as PIC. In PIC sales literature, Tri-Forex is described as PIC's parent company and touted as an international company with decades of experience trading in the foreign currency markets. Tri-Forex purports to be headquartered in London, with offices in Australia and Japan, as well as Seattle, Washington. In fact, Tri-Forex is not authorized to conduct business in these locations.

12.    **Inforex, Ltd.** ("Inforex") is a Nevada corporation which lists a "Patrick C. Gillam" as its sole office and director. "Gillam" is an alias previously used by Defendant Rogers. Inforex lists its business as currency trading and gives a corporate address in Scottsdale, Arizona. In May 2004, Inforex registered to do business in the state of Washington at the same business address as Tri-Forex and PIC. Inforex has received millions of dollars of PIC investor funds and transferred the funds to Inforex accounts located in Switzerland and Denmark.

## GERALD ROGERS: THE MAN BEHIND THE FRAUD

13.    Defendant Rogers is the chief architect of the PIC investment program and ultimately controls investor funds. For approximately 40 years, Rogers has been the subject of multiple federal and state criminal and civil actions.

14.    Rogers has been the subject of several Commission Complaints. In 1977, Rogers was permanently enjoined from violations of the registration and antifraud provisions of the federal securities laws by a federal court in California. In 1990, a second SEC fraud injunction was entered against Rogers by a federal court in California.

15.    In 1987, Rogers was convicted by a federal jury of mail and tax fraud charges relating to another investment scheme. Rogers, who was free on bond, fled the country and was a fugitive for three years, before finally being apprehended in Switzerland. Rogers was sentenced to serve 10 years in prison and five additional years on parole.

16.    In 1990 in Colorado, Rogers was convicted of mail and securities fraud for his role in a gold mine investment scheme that raised more than $70 million from thousands of investors. Rogers was sentenced to a 25-year term of imprisonment to be served consecutively with the California sentence. Rogers was released on parole in January 2004.

17.    In January 1993, a California federal court enjoined Rogers at the request of the Commodity Future Trading Commission ("CFTC"). In the CFTC action, as in this one, Rogers was the principal of an entity that purported to effectuate covered call options on deposits of five or ten years, this time in the European precious metal market.

18.    In addition to these federal actions, Rogers has been the subject of multiple state criminal proceedings and at least 11 ccase and desist and prohibition orders by eight different states. In addition, although Rogers, who resides in Washington state, was not named as a party, the Texas State Securities Board ("TSSB") recently issued a cease and desist order against the operations of PIC in the state of Texas.

## THE FRAUDULENT SCHEME

### A.    The Investment

19.    Under the direction of Rogers and Shevchenko, PIC has raised approximately $8.5 million since January 2004, from over 100 investors in at least 6 states, including at least 58 Texas residents.

20.    In January 2004, Rogers walked away from the Tucson Federal Correctional Facility after being granted parole. However, Rogers actually began laying the groundwork for the PIC fraud while he was still incarcerated, using an apparent alias and a fraudulent Arizona driver's license to create Defendant Inforex, Ltd. The same month Rogers stepped from behind prison walls, he incorporated PIC in Wyoming.

21.    By February 2004, Rogers opened the first PIC bank account and began accepting investor funds while living in Arizona. Shortly thereafter, he moved to Seattle, Washington, moving the operations of PIC with him.

22.    PIC aggressively solicits investments, purportedly for a foreign currency trading program, through a network of more than 100 agents, mass mailings, investment seminars and an Internet website. The invitation to a Dallas, Texas PIC investment seminar described the investment opportunity as being appropriate for persons who are "50 years of age and older and are either retired or contemplating retirement."

23.    The firm's website and promotional materials describe the investment program as involving the writing (or selling) of "Covered Currency Calls" on the currencies of various nations. Investors are told that PIC investments are comparable to bank CDs and Government bonds and provide "guaranteed income" with "guaranteed

locked-in-profits." Investors are also told that the company never places investor deposits at risk, thereby offering the "safety," "earnings" and "liquidity" required by "all conservative investors."

24.    In fact, PIC established a mechanism to permit investors to make PIC investments with Individual Retirement Accounts ("IRAs"), and supplied brokers with the requisite forms to facilitate these transactions.

25.    Moreover, PIC and its sales agents encourage investors to utilize home equity loans to obtain investment funds, and PIC pays brokers additional commissions when they convince investors to extract the equity from their homes.

26.    PIC and its sales agents assure investors that the investment is entirely passive, and that investors can rely entirely on the efforts and expertise of PIC and Tri-Forex.

27.    PIC's offering materials represent that its ability to conduct foreign currency transactions is facilitated by an exclusive licensing agreement with Union Bank Inter.net ("UBI"), which PIC describes as a bank domiciled in Switzerland and wholly owned by "Churchill Bank Group serving in the United Kingdom with facilities in England, Denmark, Australia, Japan and elsewhere." Rogers has represented that funds sent to Europe for foreign currency trading are deposited in an account at UBI in Switzerland.    Investors and potential investors are referred to a UBI website for additional information.

28.    PIC investors are also assured that the company's brokers do not receive a percentage of investor funds, but rather are compensated only through the proceeds of the foreign currency transactions.  PIC offering materials state that the covered calls involve

"no brokerage fees" and "no commissions," and that 100 percent of the investor's deposit is dedicated to the covered call. Brokers, on the other hand, are purportedly to be compensated with a "small bid/ask spread" paid by the call buyer, not the investor.

29.     The website claims that investor funds are placed with Tri-Forex, which writes a covered call option in $1,000 increments equal to the amount of an investor's deposit. PIC offering materials state that PIC is the USA division of Tri-Forex International, Ltd., a company purportedly located in London, England, with other international offices. Investors are told that Tri-Forex has more than 40 years of experience "writing international currency calls through its international network of currency exchange brokers."

30.     At the time of the initial investment, the investor selects one of three option expiration dates: 90 days, 60 months, or 120 months. Investors are promised monthly "premiums" paid by the purchasers of the covered calls.

31.     The website claims that the current premium being paid by a call purchaser is 2% for a 90-day call (equal to 8% per annum), 10% per annum for a 60-month call, and 12% per annum for a 120- month call. Investors who select the 60 or 120 month expiration dates have the option of either receiving their premiums periodically or adding their premiums to their principal investment.

32.     PIC also offers a 120-month "value added" currency call ("VAC") with an annual return of 14.2%. The VAC is written with a strike price equal to 110% of the investor's deposit, and if the VAC is left to the expiration date, in addition to receiving 1% per month on the 110% strike price, investors will be paid an additional 10% on their initial "deposit." PIC doesn't disclose how or from where the additional 10% is derived.

PIC does, however, market the "value added" aspect of the VAC as a means to counteract any penalties that result from liquidating an "annuity or real estate contract."

33.    All investor funds make their way to accounts in Seattle, Washington, controlled by Rogers and Shevchenko.  Funds are initially deposited in a Premium Income Account at Asia Europe American Bank on which Shevchenko is the sole signatory.  Shevchenko then transfers the funds to an account at the same bank for which Rogers is the sole signatory.  Rogers then wires funds to accounts in Europe under his exclusive control.

## B.    Misrepresentations and Omissions

34.    The PIC investment program is completely bogus.  The offer and sale of the PIC securities is rife with false and misleading statements and failure to disclose material facts, including those set forth in paragraphs 35 through 46 below.

### 1.    Returns and Safety

35.    PIC literature and brokers entice investors with the promise that the stream of premiums from covered calls offer "complete safety" and "guaranteed returns."  In fact, these blanket assurances are inconsistent with the facts relating to the foreign currency transactions described by PIC.

36.    Covered calls involve substantial risk and cannot produce a guaranteed rate of return.  As a covered call requires the purchase and sale of foreign currencies in the client's account, the value of the investor's deposit will decline in value if the currency purchased with investor funds declines.  Moreover, the potential decline in principal poses the risk of a decline in the premiums that the customers deposit will demand.  Accordingly, the entire investor deposit is at risk.

2.    **Use of Funds**

37.    PIC represents that 100 percent of investor funds are transferred to European banks and used in cover call transactions in the foreign currency markets. In fact, PIC does not use investor funds as represented.

38.    First, although customer funds are initially deposited in bank accounts in the name of PIC, Defendants do not disclose to investors that their funds are immediately transferred from these PIC accounts to a domestic bank account in the name of Inforex, under the sole control of Rogers, and then transferred to offshore accounts also controlled solely by Rogers.

39.    Second, the PIC program is operating as a Ponzi scheme. PIC has collected approximately $8.5 million from investors between May 2004 and February 2005. Nearly $7 million of these investor funds have been wired offshore to accounts in the name of Inforex. Monthly "returns" of at least $267,000 have been paid to investors from the PIC accounts. Significantly, however, there is no indication that any funds have been transferred back from Europe into PIC-related accounts. Accordingly, the investor "returns" paid by PIC are, in fact, being paid with funds provided by other investors.

40.    Third, PIC promises that no investor funds are diverted to pay broker commissions, but rather that brokers are compensated through the "bid/ask spread" paid by the call seller. In fact, PIC brokers receive substantial commissions which are paid directly from the funds collected from PIC investors. PIC brokers receive basic commissions equal to 10 percent of the gross amount collected from clients investing in the 60 month and 120 month programs. They receive commissions equal to ½ of a percent on 90 day calls, with an additional ½ percent each time the investment is renewed

for an additional 90 days. In addition, a broker receives a 1 percent override on the funds invested through any broker that he has recruited. These commissions are paid out of investor funds, not the proceeds of overseas transactions.

41.    Finally, Rogers and Shevchenko, among others affiliated with PIC, are misappropriating some or all of the investor funds that remain after PIC makes Ponzi payments to investors and pays commissions to brokers. As set forth above, Defendants are not placing these funds in profit-producing transactions nor have they returned any funds to the United States; accordingly, Defendants have absconded with these investor funds. Moreover, the account records demonstrate that investor funds have been used to pay for Rogers' personal and business expenses.

### 3.    Relationship with UBI

42.    Defendants tout their relationship with UBI, described as an international bank domiciled in Switzerland, as a crucial component of PIC's ability to successfully facilitate foreign currency transactions. In fact, UBI is not physically located in Switzerland and is not registered with the Swiss Federal Banking Commission, as required by Swiss law. Moreover, neither UBI nor the Churchill Bank Group is listed as a bank or authorized to do business in the United Kingdom, England or Australia. The UBI business address in Scotland provided by Defendants is, in fact, a residential apartment address unrelated to any business operations of UBI.

43.    Furthermore, the UBI website to which investors are referred is not affiliated with a European entity, but rather is registered to a business located in Scottsdale, Arizona and is paid for by credit cards in the name of Rogers and Inforex.

44.     Finally, contrary to representations made by Rogers, funds transferred to Europe were never deposited at UBI bank.

### 4.     Tri-Forex

45.     Defendants' representations about the international scope of Tri-Forex are false.  Contrary to Defendants' statements, Tri-Forex has no registered business address and is not authorized to conduct business in London, England, Sydney, Australia or Seattle.

### 5.     Role of Rogers and Inforex

46.     As set forth above, PIC sales literature emphasizes the long history of honesty and integrity of PIC's parent company, Tri-Forex.  Investors, however, are never told that the entire scheme is concocted and controlled by Rogers, a securities fraud recidivist and convicted felon still on parole.  Moreover, Rogers' and Inforex's role in controlling investor funds is never disclosed to investors or potential investors.

### C.     The Increasing Threat to the Investing Public

47.     The PIC scheme presents an increasing threat to the investing public.  In mid-February, PIC increased its potential investor pool by qualifying as a vehicle for the investment of IRA funds.  In addition, PIC recently began an entirely new campaign to encourage investors to seek home equity loans for the purpose of placing money in the PIC foreign currency programs.

48.     Defendants have not abated their activities in spite of regulatory action already directed at the PIC scheme.  On February 3, 2005, the TSSB issued a cease and desist order requiring sales agents in Texas to halt the offer and sale of PIC securities.  In

response to this development, Rogers instructed PIC brokers that they should continue with "business as usual in the other 49 states."

49.    In fact, the PIC scheme is expanding at an alarming rate.  Over $2.4 million was deposited with PIC in the first 24 days of February, a more than three-fold increase over the deposits made in any prior month.

**FIRST CLAIM**
**Violations of Section 17(a) of the Securities Act**

[As to All Defendants]

50.    Plaintiff Commission repeats and incorporates paragraphs 1 through 49 of this Complaint by reference as if set forth *verbatim*.

51.    The Defendants, directly or indirectly, singly or in concert with others, in connection with the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have:  (a) employed devices, schemes and artifices to defraud;  (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and  (c)  engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

52.    As a part of and in furtherance of their scheme, the Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 49 above.

53.    With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, the Defendants were negligent in their actions regarding the representations and omissions alleged herein.  With respect to violations of Section 17(a)(1) of the Securities

Act, the Defendants made the above-referenced misrepresentations and omissions knowingly or with severe recklessness regarding the truth.

54.     By reason of the foregoing, the Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

[As to All Defendants]

55.     Plaintiff Commission repeats and incorporates paragraphs 1 through 49 of this Complaint by reference as if set forth *verbatim*.

56.     The Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have:  (a) employed devices, schemes and artifices to defraud;  (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

57.     As a part of and in furtherance of their scheme, the Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 49 above.

58.    The Defendants made the above-referenced misrepresentations and omissions knowingly or with severe recklessness regarding the truth.

59.    By reason of the foregoing, the Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM
### Violations of Section 5(a) and 5(c) of the Securities Act

[As to All Defendants]

60.    Plaintiff Commission repeats and incorporates paragraphs 1 through 49 of this Complaint by reference as if set forth *verbatim.*

61.    Defendants, directly or indirectly, singly and in concert with others, have been offering to sell, selling and delivering after sale, certain securities, and have been, directly and indirectly: (a) making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of written contracts, offering documents and otherwise; (b) carrying and causing to be carried through the mails and in interstate commerce by the means and instruments of transportation, such securities for the purpose of sale and for delivery after sale; and (c) making use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

62.    As described in paragraphs 1 through 49, the PIC investments described in detail herein, have been offered and sold to the public through a general solicitation of investors.  No registration statements were ever filed with the Commission or otherwise in effect with respect to these securities.

63.    By reason of the foregoing, the Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

### I.

Temporarily, preliminarily and permanently enjoin all Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

### II.

Enter an Order *instanter* freezing the assets of all Defendants and directing that all financial or depository institutions comply with the Court's Order.  Furthermore, order *instanter* that Defendants repatriate any funds held at any bank or other financial institution not subject to the jurisdiction of the Court, and that they direct the deposit of such funds as directed by the Court, pending conclusion of this matter.

### III.

Order *instanter* that Defendants shall file with the Court and serve upon Plaintiff Commission, no later than 72 hours before the preliminary injunction hearing, an accounting, under oath, detailing all of their assets and all funds or other assets received from investors and from one another.

### IV.

Order *instanter* that Defendants be restrained and enjoined from destroying, removing, mutilating, altering, concealing or disposing of, in any manner, any of their books

and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court.

## V.

Order *instanter* the appointment of a receiver *pendente lite* over Defendants, for the benefit of PIC investors, to marshal, conserve, protect and hold funds and assets obtained by the defendants and their agents, co-conspirators and others involved in this scheme, wherever such assets may be found, or, with the approval of the Court, dispose of any wasting asset in accordance with the application and proposed order provided herewith.

## VI.

Order that the parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require production of documents, or the deposition of any party or party-representative, on 72 hours notice.

## VII.

Order the Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

## VIII.

Order civil penalties against the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], for the violations alleged herein.

**IX.**

Order *instanter* that Defendants surrender their passports to the Clerk of this

Court, to hold until further order of this Court.

**X.**

Order such further relief as this Court may deem just and proper.

For the Commission, by its attorneys:

Dated: March 2, 2005                         Respectfully submitted,

                                             JEFFREY B. NORRIS
                                             Washington, D.C. Bar No. 424248
                                             Attorney for Plaintiff
                                             SECURITIES & EXCHANGE
                                             COMMISSION
                                             801 Cherry Street, Suite 1900
                                             Fort Worth, Texas 76102
                                             (817) 978-3821/-6452
                                             FAX: (817) 978-4927
                                             Norrisj@sec.gov

Of Counsel:

Spencer C. Barasch, Washington, D.C. Bar No. 388886
Stephen Webster, Texas Bar No. 21053700
Eric Werner, Texas Bar No. 24033919
Securities and Exchange Commission
Fort Worth District Office
801 Cherry Street, 19th Floor
Fort Worth, TX 76102-6882

JS 44 (Rev. 11/94)

# ORIGINAL

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

**3 05 CV 0415 M**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEY (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Jeffrey B. Norris
U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, TX 76102
(817) 978-6452

## DEFENDANTS

PREMIUM INCOME CORP., INFOREX, LTD.,
TRI-FOREX INTERNATIONAL, LTD.
also known as TRI-FOREX, LTD. and
INTERNATIONAL FOREX COMPANY,
GERALD LEO ROGERS also known as JAY ROGERS and JAY
RODGERS, and ALEXANDER IGOR SHEVCHENKO

County of Residence of First Listed Defendant:   King
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
OF LAND INVOLVED.

ATTORNEYS (IF KNOWN)

**RECEIVED**

**MAR - 2 2005**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                AND ONE BOX FOR DEFENDANT)

| | PTF | PTF | | PTF | PTF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | | | |
| | | | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | PERSONAL INJURY | TORTS — PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 630 Liquor Laws | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 640 R.R. & Truck | PROPERTY RIGHTS | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organization |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 690 Other | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | | | | ☒ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | LABOR | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395FF) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 535 Death Penalty | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (Specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Brief Description of cause: Sections 17(a), 5(a), 5(c) of the Securities Act of 1933 [15 U.S.C. § 77q(a), 77e(a), 77e(c)] and Section 10(b) Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND ☐ YES   ☐ NO

## VIII. RELATED CASE(S) (See Instructions):
IF ANY

JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

FOR OFFICE USE ONLY

Receipt # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

☐ **ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

MAR - 2 2005

CLERK, U.S. DISTRICT COURT
By _____
Deputy

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| vs. | : Civil Action No. |
| PREMIUM INCOME CORP., INFOREX, LTD., TRI-FOREX INTERNATIONAL, LTD. also known as TRI-FOREX, LTD. and INTERNATIONAL FOREX COMPANY, GERALD LEO ROGERS also known as JAY ROGERS and JAY RODGERS, and ALEXANDER IGOR SHEVCHENKO, | : : : : : : **3 - 05 CV 0415 M** |
| Defendants. | : |

Certified a true copy of an instrument
on file in my office on 3-3-05
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

## ORDER APPOINTING TEMPORARY RECEIVER

This matter came on before me, the undersigned United States District Judge, this 2nd

day of _March_ 2005, on the motion of Plaintiff Securities and Exchange Commission

("Commission") for the appointment of a Temporary Receiver for all Defendants in this case. It

appears that this Order Appointing Temporary Receiver is both necessary and appropriate in order

to prevent waste and dissipation of the assets of the Defendants to the detriment of investors.

**I.**

**IT IS THEREFORE ORDERED:**

1.     This Court hereby takes exclusive jurisdiction and possession of the assets,

monies, securities, claims in action, and properties, real and personal, tangible and intangible, of

whatever kind and description, wherever situated, of Defendants or any entities controlled by

Defendants ("Receivership Assets"), and the books and records of the Defendants ("Receivership Records").

2. _____ KELLY CRAWFORD _____, located at SCHEEF & STONE, 5956 SHERRY LN #1400, DALLAS, TX 75225 with the phone number of (214) 706-4200, facsimile number 214-706-4242 is appointed Temporary Receiver ("Receiver") for the Receivership Assets. The Receiver shall file with the Clerk of this Court a bond in the sum of $10,000, without need for sureties approved by the Court, to assure his conscientious performance of the duties and responsibilities imposed by this Order. The Receiver is hereby authorized to take and have possession of the Receivership Assets and Receivership Records. Until further order of this Court, the Receiver shall have complete and exclusive control, possession, and custody of all Receivership Assets and Receivership Records.

3. All persons, including Defendants and their officers, agents, servants, employees, brokers, facilitators, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and specifically including any bank or other financial or depository institution holding accounts for or on behalf of Defendants herein, shall promptly deliver to the Receiver all Receivership Assets in the possession or under the control of any one or more of them and shall promptly surrender all Receivership Records. No separate subpoena shall be required. Upon presentment of this Order, all persons, including financial institutions, shall provide account balance information, transaction histories, all account records and any other Receivership Records to the Receiver or his agents, in the same manner as they would be provided were the Receiver the signatory on the account.

4.    The Receiver is authorized, without breaching the peace and if necessary with the assistance of local peace officers or U.S. Marshals, to enter and secure any premises, wherever located or situated, in order to take possession, custody, or control of, or to identify the location or existence of Receivership Assets or Receivership Records.

5.    All persons, including Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, are enjoined from in any way interfering with the operation of the Receivership or in any way disturbing the Receivership Assets and Receivership Records, from filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Assets and Receivership Records, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the prior permission of this Court.    Any actions so authorized to determine disputes relating to Receivership Assets and Receivership Records shall be filed in this Court.

6.    The Receiver is hereby authorized to make appropriate notification to the United States Postal Service to forward delivery of any mail addressed to Defendants or any company or entity under the direction or control of any of the Defendants, to himself.  Further, the Receiver is hereby authorized to open and inspect all such mail, to determine the location or identity of assets or the existence and amount of claims.

7.    The Receiver is hereby authorized to make from Receivership Assets such ordinary and necessary payments, distributions, and disbursements as he deems advisable or proper for the marshaling, maintenance or preservation of the Receivership Assets.  From and after the date of entry of this Order, the Receiver shall have the authority to conduct the business operations of Defendants and the entities they control, including the collection of rents or

continuation and termination or any employment arrangement and the terms thereof. The Receiver shall have the authority to contact and negotiate with any creditors of Defendants for the purpose of compromising or settling any claim. To this purpose, in those instances in which Receivership Assets serve as collateral to secured creditors, the Receiver may surrender such assets to secured creditors, and shall have the authority to make such surrender conditional upon the waiver of any deficiency of collateral. Furthermore, the Receiver is authorized to renew, cancel, terminate, or otherwise adjust any agreements to which any of these Defendants are a party.

8.      The Receiver is hereby directed to file with this Court and serve upon the parties, within 30 days after entry of this Order, a preliminary report setting out the identity, location and value of the Receivership Assets, any liabilities pertaining thereto and any assets of the Defendants beyond the value of the assets received from Defendants in the course of the events made the basis of this action. Further, at the time the Receiver makes such report, he shall recommend to the Court whether, in his opinion, based on his initial investigation, claims against Defendants should be adjudged in the Bankruptcy Court. After providing the parties an opportunity to be heard, this Court will determine whether to accept the Receiver's recommendation and, if appropriate, issue an order authorizing the Receiver to commence a bankruptcy proceeding.

9.      This Order does not prohibit the prosecution of any civil action or other proceeding against Defendants, including non-dischargeability proceedings and enforcement of any judgments obtained in such actions or proceedings, or effect the release of any claim asserted therein. However, to the extent judgment creditors or other claimants seek to prosecute an action or proceeding against the Defendants or to satisfy a judgment or claim from Receivership Assets,

Order Appointing Temporary Receiver                                          4
*SEC v. Premium Income Corp., et al.*

they will do so only with the prior permission of this Court or the United States Bankruptcy Court in the event the Receiver recommends and the Court approves commencement of such a proceeding, and in accordance with an order of priority established by a plan of liquidation and distribution, or any automatic or other stay provided under the Bankruptcy Code.

10.    The Receiver is hereby authorized to employ such employees, accountants, and attorneys and others as are necessary and proper for the collection, preservation, maintenance and operation of the Receivership Assets and Receivership Records.

11.    The Receiver is hereby authorized to receive and collect any and all sums of money due to Defendants, whether the same are now due or shall hereafter become due and payable, and is authorized to incur such expenses and make such disbursements as are necessary and proper for the collection, preservation, maintenance and operation of the Receivership Assets.

12.    The Receiver is hereby authorized to institute, defend, compromise or adjust such actions or proceedings in state or federal courts now pending and hereafter instituted, as may in his discretion be advisable or proper for the protection of the Receivership Assets or proceeds therefrom, and to institute, prosecute, compromise or adjust such actions or proceedings in state or federal court as may in his judgment be necessary or proper for the collection, preservation and maintenance of the Receivership Assets.

13.    The Receiver is hereby authorized to institute such actions or proceedings to impose a constructive trust, obtain possession and/or recover judgment with respect to persons or entities who received assets or funds traceable to investor monies. All such actions shall be filed in this Court.

Order Appointing Temporary Receiver                                        5
*SEC v. Premium Income Corp., et al.*

14.    Upon the request of the Receiver, the United States Marshal's Office is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody or control of, or identify the location of, any Receivership Assets or Receivership Records. The Receiver is authorized to remove any person from any premises or real estate constituting a Receivership Asset that attempts to interfere with the Receiver, his attorneys or agents in the performance of their duties. The Receiver is further authorized to change any locks or other security mechanisms with respect to any premises or other assets that constitute Receivership Assets.

15.    The Receiver shall keep the Commission apprised at reasonable intervals of developments concerning the operation of the receivership, and shall provide to the Commission upon request any documents under the control of the Receiver.

16.    The Receiver shall file on at least a quarterly basis an application for approval of the disbursements for professional fees and expenses to himself or others. Any and all costs incurred by the Receiver shall be paid from the Receivership Assets.

## II.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this action for all purposes. The Receiver is hereby authorized, empowered and directed to apply to this Court, with notice to the Commission and Defendants for issuance of such other orders as may be necessary and appropriate in order to carry out the mandate of this Court.

## III.

IT IS FURTHER ORDERED that this Order will remain in effect until modified by further order of this Court.

Order Appointing Temporary Receiver                                                                6
*SEC v. Premium Income Corp., et al.*

Dated this 2ⁿᵈ day of _March_, 2005.

_____
UNITED STATES DISTRICT JUDGE